An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-696

Filed 15 April 2026

Cabarrus County, No. 24JA000030-120

IN THE MATTER OF:
J.R.T.

Appeal by Respondent from order entered 8 April 2025 by Judge S.E. Street in Cabarrus County District Court. Heard in the Court of Appeals 12 February 2026.

*Hooks Law, P.C., by Laura G. Hooks, for Respondent–Appellant Mother.*

*Hartsell & Williams, P.A., by Kimberly B. Kisner, for Petitioner–Appellee Cabarrus County Department of Social Services.*

*Administrative Office of the Courts, by N.C. Guardian ad Litem Appellate Counsel Matthew D. Wunsche, for Appellee Guardian ad Litem.*

PER CURIAM.

Respondent Mother appeals from a permanency-planning order eliminating reunification as a permanent plan for her minor child, J.R.T. (Jayden),[1] and changing the permanent plan to legal guardianship. For the reasons below, this Court affirms the trial court's order.

---

[1] In accordance with North Carolina Rule of Appellate Procedure 42(b), we refer to the minor child by a pseudonym to protect his identity. *See* N.C. R. App. P. 42(b).

## I.    Background

Mother gave birth to Jayden in February of 2024 at the home of her niece in Cabarrus County, North Carolina. Immediately afterwards, EMS transferred Jayden to the hospital due to neonatal health complications. That same day, the Cabarrus County Department of Social Services (CCDSS) received a Child Protective Services report alleging that Mother had refused medical treatment for the infant at the hospital despite medical professionals' concerns about his tremors and shaking. When CCDSS spoke with Mother, "it became clear that [she] was suffering from a delusional episode." Mother was involuntarily committed for her mental health without having set a plan of care for Jayden. CCDSS immediately filed a juvenile petition for Jayden alleging neglect and dependency, and the trial court granted CCDSS nonsecure custody.

The trial court held a pre-adjudication hearing the following week, at which Mother was not present but was represented by provisional counsel. Following the hearing, the trial court placed Jayden in the care and custody of Mother's niece and ordered him to have CCDSS-supervised visitation with Mother. The trial court set the next pre-adjudication hearing for 21 March 2024 and appointed Jayden a guardian *ad litem* (GAL). Following that next hearing, the trial court ordered legal custody of Jayden to remain with CCDSS in his current placement with Mother's niece and allowed Mother one hour of supervised weekly visitation.

Following adjudication and disposition hearings on 13 June 2024, the trial

court adjudicated Jayden neglected and dependent and concluded that returning him to Mother's care and custody would be contrary to his best interests. The trial court adopted the recommended CCDSS case plan, requiring Mother to complete psychological evaluations, report any prescribed medication to CCDSS, attend approved parenting courses, obtain suitable housing and sufficient income to care for Jayden, follow a visitation plan, and update the assigned CCDSS social worker biweekly on her case-plan progress. The trial court also ordered a primary plan of reunification with a secondary plan of legal guardianship.

Upon reviewing the matter at a permanency-planning hearing on 8 August 2024, the trial court concluded that Mother had not made adequate progress on the case plan. The trial court found that she had failed to schedule psychological evaluations, completed only two out of twelve required parenting classes, had not obtained housing or employment, and did not contact CCDSS biweekly as required. As a result, the trial court ordered Jayden to remain in the care of Mother's niece under CCDSS custody and maintained the primary plan of reunification and secondary plan of guardianship.

On 13 March 2025, the trial court held a permanency-planning hearing, at which Mother's assigned CCDSS social worker testified to Mother's continued insufficient progress on the case plan. She claimed that Mother informed CCDSS that she had moved to New York City in the autumn of 2024, which caused her to miss scheduled appointments for psychological assessments and parenting evaluations.

The social worker explained that, because Mother took a five-month "break" from therapy due to her move, her mental-health service provider had recommended that Mother "re-engage" and "complete additional services," which she had not done. Although Mother had "sent over pay stubs from her job," the social worker had been unable to "review them fully" due to Mother's providing them "[r]ight before court." The social worker further testified that Mother "wouldn't give [the social worker] the information of where she [wa]s living," though Mother "did state . . . [it wa]s not suitable for children." Mother testified to living in a New York City shelter, working as a substitute teacher on an "as-needed" basis, and relying on others for transportation.

Mother's niece testified that she had cared for Jayden for over a year, fulfilling his medical, dental, and transportation needs. She also testified to the two other children in her care and her consistent employment with a consulting agency for over three years. She called Jayden "a joy to have" in her home and testified to completing a financial affidavit that "fairly and accurately represent[ed her] . . . income and expenses"; she further testified to "underst[anding] the legal significance of being the guardian for [Jayden]." The trial court also considered the report of Jayden's GAL, which documented Jayden's "loving bond" with Mother's niece and recommended that the trial court grant her legal guardianship of him.

Following the hearing, the trial court entered an order making detailed findings regarding Mother's very limited progress on her case plan and the suitability

of her niece to serve as guardian for Jayden. Specifically, the trial court found that Mother completed only nine of the ten required mental-health therapy sessions and failed to "follow[ ] through" with resuming sessions after the service provider recommended additional sessions. The trial court further found that Mother's current housing was "not suitable for any of her children," that she "refuses to inform CCDSS on where she is currently staying," and that she "has not provided CCDSS with the name of [her] employer or a paystub to confirm employment when requested." Finally, the trial court found that Mother had pending termination actions for her other "children in the custody of [New York] state" and incorporated into its order the report of Jayden's GAL, which references these out-of-state termination actions. As a result, the trial court ceased reunification efforts and granted guardianship of Jayden to Mother's niece. Mother timely appealed.

## II.     Jurisdiction

This Court has jurisdiction to hear Mother's appeal of the trial court's order because it "eliminat[es] reunification . . . as a permanent plan" for the juvenile. N.C.G.S. § 7B-1001(a)(4) (2025).

## III.     Analysis

On appeal, Mother claims that the trial court erred by failing to support its elimination of reunification as a permanent plan for Jayden with sufficient findings and by appointing her niece as his legal guardian without proper verification. We review a permanency-planning order solely to determine "whether there is competent

5

evidence in the record to support the findings and whether the findings support the conclusions of law." *In re P.O.*, 207 N.C. App. 35, 41 (2010). We consider the trial court's findings of fact "conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." *In re Norris*, 65 N.C. App. 269, 275 (1983). Uncontested findings are binding on appeal. *See In re A.P.W.*, 378 N.C. 405, 410 (2021). For the reasons below, we hold that the trial court made sufficient findings to support cessation of reunification efforts with Mother and to appoint Mother's niece as Jayden's legal guardian.

## A. Cessation of Reunification Efforts

First, Mother argues that the trial court erred both by reaching Findings of Fact (FoFs) 10, 12, 22–24, and 26–30 and by failing to document certain other findings required by N.C.G.S. § 7B-906.2. As discussed below, we disagree on both counts.

### 1. Challenged Findings

Mother argues that the trial court erred by ceasing reunification efforts without sufficient findings of her progress on the CCDSS case plan and challenges the trial court's FoFs 10, 12, and 23 as unsupported by the evidence. We disagree.

#### a. Insufficient Progress

Mother challenges the portion of FoF 10 that her case-plan progress "insufficient[ly] . . . assured" the trial court "that the juvenile could safely return to her care" and its three identified instances of insufficient progress regarding mental health services, housing, and employment. Mother's case plan had required her to

6

"obtain and maintain suitable housing for the placement of [Jayden] for at least 6 months" and "provide CCDSS with a copy of her lease." The case plan also required Mother to "contact the assigned social worker every other week" regarding her case plan progress and to "complete a psychological . . . [and] psychiatric evaluation with a CCDSS[-]approved provider to determine her need for medication." As to mental health services, Mother argues that she completed "all 10 of the recommended individual [therapy] sessions" instead of "9 out of the 10 individual therapy sessions" as the trial court found. As to housing, Mother argues that her testimony of "staying at a shelter in NYC" for lodging does not support the trial court's finding of her "refus[al] to inform CCDSS on where she is currently staying." In contrast to the trial court's finding to the contrary, Mother also contends that she "provid[ed] paystubs" to CCDSS to confirm her employment.

At the permanency-planning hearing, the CCDSS social worker testified to Mother's completion of all ten of the required mental-health therapy sessions. However, the social worker also testified that Mother needed to "re-engage" in her therapy," "ha[d] not done her psychological" evaluation, and that Mother's "mental health [wa]s still in question" due to her failure to re-engage in therapy. In the unchallenged portion of FoF 10, the trial court found that Mother "ha[d] not followed through" with reengagement in therapy after CCDSS "referred [her] to . . . additional assistance with finding services to address her mental health." The unchallenged findings also indicate Mother's lack of progress with medication management and

7

failure to sign releases of mental-health information to keep CCDSS informed of her progress. Thus, competent evidence supported the trial court's findings of Mother's insufficient progress regarding mental health.

As to employment, the trial court found that Mother reported employment at a New York school but failed to provide CCDSS with her employer's name or a paystub to confirm her employment "when requested." The social worker testified that Mother had "sent over pay stubs from her job" "[r]ight before court" despite a CCDSS request for the pay stubs some weeks prior. Due to the imminent hearing, the social worker "ha[d] not been able to review them fully." This testimony supports the trial court's finding that Mother had not provided the required employment confirmation "when requested." As to housing, Mother had failed to "immediately" inform her social worker of changes in address as required by her case plan. The social worker testified that Mother had changed her housing and would not provide further information beyond admitting its unsuitability for children.

Overall, competent evidence supports the challenged portions of FoF 10:Mother's failure to re-engage in mental health services; find permanent, stable housing; and timely update CCDSS regarding her employment and her medication management. Except for the portion of FoF 10 that Mother had only attended nine of the ten required therapy sessions, the trial court properly found that Mother failed to make sufficient progress in nine of the ten areas addressed by her case plan.

Mother also challenges FoF 23, in which the trial court found her progress

"insufficient" for Jayden to "safely return" to her care. Mother argues that competent evidence does not support FoF 23 due to her "complet[ion of] her mental health services"; her consistent visitation with Jayden when she was in North Carolina; and her lack of completed psychological evaluations being due to the provider's delay in responding to her. Mother also argues there was no testimonial or documentary evidence regarding a pending termination of parental rights action in New York. But the trial court's unchallenged findings support FoF 23. The evidence notes Mother's "incomplete assessments and evaluations" and failure to complete mental-health services, and it documents her inconsistent contact with Jayden and the parental termination actions pending against her in New York regarding her other "children in the custody of [New York] state." Thus, competent evidence supports the trial court's finding of Mother's insufficient progress in FoF 23.

### b. *Conclusions of Law*

Mother also challenges FoFs 22, 24, and 26–30, arguing that they are conclusions of law which this Court must review *de novo*. These findings relate to the trial court's determination that guardianship with Mother's niece would further Jayden's best interests, that reunification with Mother would be inappropriate and contrary to his best interests, and that Mother "abdicated her parental role and responsibilities" by leaving Jayden in CCDSS custody. Mother makes no specific argument regarding these findings beyond characterizing them as conclusions of law that warrant *de novo* review. Thus, we need not address them further. *See* N.C. R.

App. P. 28(b)(6). To the extent that these findings are conclusions of law, the trial court's findings of fact fully support them.

## 2. *Statutory Findings*

Next, Mother contends that the trial court failed to make required findings under N.C.G.S. § 7B-906.2 regarding the four "designated considerations" for cessation of parental reunification efforts. To eliminate reunification as a juvenile's primary or secondary permanent plan, a trial court must "make[ ] written findings that reunification efforts clearly would be unsuccessful or . . . inconsistent with the juvenile's health or safety . . . at any permanency planning hearing." N.C.G.S. § 7B-906.2(b). More specifically, the trial court must document its consideration of the following factors: whether the parent is (1) "making adequate progress within a reasonable period of time under the [case] plan"; (2) "actively participating in or cooperating with the [case] plan," DSS, and the juvenile's GAL; (3) making herself "available to the court," DSS, and the juvenile's GAL; and (4) "acting in a manner inconsistent with the [juvenile's] health or safety." *Id.* § 7B-906.2(d). "While the findings need not track the statutory language, they must make clear that the trial court considered the evidence in light of whether reunification would be . . . inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *A.P.W.*, 378 N.C. at 415 (quotation omitted).

Here, the trial court made findings relating to each of the factors in N.C.G.S. § 7B-906.2(d). These findings address the required statutory findings and expressly

"consider[ ] the evidence in light of whether reunification would be . . . inconsistent" with Jayden's safety, welfare, and need for permanence. *Id.*; *see* N.C.G.S. § 7B-906.2(d). Thus, we reject Mother's argument to the contrary and hold that the trial court's findings met the statutory requirement for cessation of reunification.

## B. Guardianship Appointment

Finally, Mother claims that the trial court erred by appointing her niece as Jayden's legal guardian without first properly verifying her "understand[ing of] the legal significance" of the guardianship appointment or her "adequate resources to care appropriately" for Jayden. N.C.G.S. § 7B-906.1(j). Upon appointing a juvenile guardian, the trial court must "verify" that the appointed guardian "understands the legal significance of the appointment and will have adequate resources to care appropriately for the juvenile." *Id.* § 7B-600(c). The verification process does not "require that the court make any specific findings" but allows it to consider factors such as a potential guardian's past childrearing experience, income and financial situation, physical health, and DSS documentation regarding these factors. *In re J.E.*, 182 N.C. App. 612, 616–17 (2007). In addition, "[t]he fact that the prospective guardian has provided a stable placement for the juvenile for at least six consecutive months is evidence that the person has adequate resources." N.C.G.S. § 7B-600(c). Upon review, we hold that the trial court properly verified that Mother's niece understood the legal significance of guardianship and had appropriate resources to care for Jayden.

11

The trial court's unchallenged FoF 25 found that Mother's niece "underst[ood] the legal significance of the placement of [Jayden] in her home and that she has adequate resources to care for the child appropriately"; it also documents the trial court's review of her financial affidavit. The trial court also made unchallenged findings that Jayden had been in her care since birth, that Jayden's placement with her was stable and in his best interests, and that Jayden was "attached" to her as his caregiver and "thriving" in her care. Because Mother does not specifically challenge these findings as unsupported by the evidence, they are binding on appeal. Further, even without the trial court's review of the financial affidavit of Mother's niece, her care for Jayden for over six months would be sufficient evidence to support the trial court's finding as to her resources. *See id.* § 7B-600(c).

Mother argues that the trial court did not adequately verify her niece's understanding of her legal responsibility as a guardian. In support, she cites to *In re J.M.*, 271 N.C. App. 186 (2020), in which this Court inquired of a proposed guardian regarding her understanding of her right to represent the child in legal matters, enroll in school, and consent to medical care, among other aspects. But the trial court need not ask these exact questions; they merely constitute examples of possible questioning of a potential guardian. Indeed, this Court has held that sufficient evidence showed a guardian's understanding of the legal significance of her appointment even when a trial court did not "expressly ask[ ] about her understanding of her legal obligations." *In re K.B.*, 290 N.C. App. 61, 64 (2023), *aff'd*,

12

386 N.C. 68 (2024). In so holding, this Court noted the evidence that the children had been living with the guardian for three years and the guardian's care for them showed that she understood her obligations. *Id.*

Here, Mother's niece testified to her consistent care for Jayden since birth, to completing a financial affidavit related to his care, and to "understand[ing] the legal significance of being the guardian for [Jayden]." The trial court's order shows appropriate consideration of her previous childrearing experience for her own two children, her stable employment and financial history, and her ongoing care of Jayden during the pendency of this matter. The trial court's findings of fact demonstrate that it properly verified her understanding of guardianship.

## IV. Conclusion

For the reasons discussed above, this Court affirms the trial court's order eliminating reunification as a permanent plan for Jayden and appointing Mother's niece as his legal guardian.

AFFIRMED.

Panel consisting of Judges STROUD, GRIFFIN, and MURRY.

Judge STROUD concurs in result only by separate opinion.

Report per Rule 30(e).

No. COA25-696 – *In re: J.R.T.*

STROUD, Judge, concurring in result only.

I concur only in the result.[2] I write separately to note my belief that no court or party should rely on this unpublished opinion under Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure. *See* N.C. R. App. P. 30(e)(3) ("If a party believes . . . that an unpublished opinion has precedential value to a material issue in the case and that there is no published opinion that would serve as well, the party may cite the unpublished opinion . . . ."). In the interest of protecting this Court's jurisprudence and preventing potential confusion among trial judges and litigants, I write briefly to explain why.

The *per curiam* majority opinion is unpublished and thus nonprecedential. "Unpublished" is a term of art. Under our appellate rules, it means that a decision is not "controlling legal authority." *Id.* Citing unpublished opinions is generally "disfavored"[3] unless "a party believes . . . that an unpublished opinion has

---

[2] A judge who "concurs in result only" agrees with the case's outcome but "disagree[s] with the majority's reasoning." Bryan A. Garner et al., *The Law of Judicial Precedent* 182 (2016). A judge may also concur in result where she has broader concerns about how the opinion presents the case. *See, e.g.*, *Inscoe v. Ishee*, 298 N.C. App. 358, 381, 915 S.E.2d 448, 463 (2025) (Hampson, J., concurring); *Travelers Indem. Co. of Connecticut v. Triple S Mktg. Grp.*, 213 N.C. App. 425, 714 S.E.2d 274 (2011) (Ervin, J., concurring in part and concurring in the result in part). That's my position here. I decline to detail my specific concerns. Concurring opinions have been called "legal clutter" that may create confusion and encourage litigation, Meg Penrose, *Legal Clutter: How Concurring Opinions Create Unnecessary Confusion and Encourage Litigation*, 31 Geo. Mason L. Rev. F. 65 (2023), and I do not wish to add to that problem. For that reason, I limit this concurrence to a single point: why I discourage reliance on this unpublished opinion.

[3] Our Rules of Appellate Procedure explicitly allow a party to cite an unpublished opinion to establish "claim preclusion, issue preclusion, or the law of the case." N.C. R. App. P. 30(e)(3).

precedential value to a material issue in the case and that there is no published opinion that would serve as well." *Id.* Even then, the party must "indicate the opinion's unpublished status"—usually by placing an (unpublished) parenthetical at the end of a citation—and serve a copy "on all other parties" and "on the court." *Id.*

Most of this Court's opinions are unpublished. Based on our court's internal statistics, only about one-third of our cases have been published over the last ten years. Given that volume, it is not surprising that litigants, attorneys, and trial courts regularly rely on unpublished opinions. And the bar for doing so is low—a party need only "believe[ ]" that the opinion has "precedential value to a material issue in the case" and that no published case "serves as well." *Id.* Against that background, however, I strongly discourage such reliance here.

There are several reasons for this admonition. For one thing, cases go unpublished for reasons beyond those stated in Rule 30(e)(1). The rule allows a panel to "direct that no opinion be published" if it determines the case "involves no new legal principles" and "would have no value as a precedent." *Id.* at 30(e)(1). But the reality is more nuanced. Judges often consider a range of other factors when deciding whether to publish a decision. *See* Hon. Donna S. Stroud, *The Bottom of the Iceberg: Unpublished Opinions*, 37 Campbell L. Rev. 333, 352-54, 356 (2015) (outlining some thirteen factors a judge may consider in deciding whether to publish a decision). An unpublished opinion may therefore be unworthy of future citation for reasons unrelated to Rule 30(e)(1)'s criteria. And if such an opinion contains legal error,

misrepresents the facts, or omits material context, there is no guarantee that anyone relying on it will recognize those problems.

That said, unpublished opinions are often helpful to both trial courts and this Court. *See, e.g.*, *Zurosky v. Shaffer*, 236 N.C. App. 219, 233-34, 763 S.E.2d 755, 764 (2014) (noting that unpublished cases "may be used as persuasive authority at the appellate level if the case is properly submitted and discussed and there is no published case on point"). But when an unpublished opinion is flawed in some way, the ease of citation under Rule 30(e)(3) can produce unintended results. *See* N.C. R. App. P. 30(e)(3). When the law does not support a party's position, no published case will "serve" that party's purposes—the precedential cases, by definition, cut the other way. *Id.* An unpublished opinion that gets the law wrong or distorts the record, by contrast, may be the only authority that supports the argument. And because no published case "serve[s] as well," Rule 30(e)(3) permits the citation. *Id.* It is possible that a flawed unpublished opinion is *more* likely to be cited to support a position the precedential cases do not support. The dynamic is self-reinforcing: The law does not support the position, which means no published case will "serve as well," which in turn permits that party to cite the unpublished opinion—even though it supports the party's position only because it gets the law wrong. *Id.*

This Court has cautioned against undue reliance on unpublished authority. In *State ex rel. Moore County Board of Education v. Pelletier*, we found that the "propositions" the party sought to support did not "justif[y] citation to the

- 3 -

[unpublished] opinion" and "reiterate[d] that citation to unpublished opinions is intended solely in those instances where the persuasive value of a case is manifestly superior to any published opinion." 168 N.C. App. 218, 222, 606 S.E.2d 907, 909 (2005). A judge asked to rely on an unpublished opinion thus bears an additional burden. She must first determine whether a published case truly does not "serve as well," N.C. R. App. P. 30(e)(3), because precedential authority controls if it exists. *Pelletier*, 168 N.C. App. at 222, 606 S.E.2d at 909. And if no published case does, she must evaluate whether the unpublished opinion itself contains legal error or presents the case inaccurately. *Id.* Appellate judges have the staff, resources, and ready access to briefs and records to conduct that research. Trial judges—the ones most often asked to rely on unpublished opinions—typically do not.

Of most concern, undue reliance on flawed unpublished opinions can, over time, erode horizontal *stare decisis*. Under that doctrine, "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30 (1989). But when courts rely on an unpublished opinion that gets the law wrong, presents the case inaccurately, or tells only part of the story, and later courts cite those decisions in turn, the error compounds—gradually displacing the precedent that should control.

One Justice on our Supreme Court recently discussed both horizontal *stare decisis* and adherence to Supreme Court precedent in terms that underscore my concerns:

> In a perfect world, [horizontal *stare decisis*] would provide consistency and stability in the law.
>
> But we have seen a pattern of decisions from the Court of Appeals that conflict not only with prior Court of Appeals opinions but with clear precedent from this Court. The *per curiam* opinion . . . reminds the Court of Appeals that it is bound to follow our decisions. Such a declaration is so obvious that it need not be made.
>
> But inattentiveness or recalcitrance by the Court of Appeals can have the practical effect of overruling this Court's precedent, and the Constitution does not give the Court of Appeals this authority.

*In re N.M.W.*, No. 159PA25, ___ N.C. ___, ___ S.E.2d ___, ___ (2026) (Berger, J., concurring). I concur in the result only and discourage any future citation to this opinion under Rule 30(e)(3).